UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

C. P.

          Plaintiff,

    v.

Social Security Commissioner,

          Defendant.

Case No. 24-cv-06986-LJC

**ORDER RESOLVING SOCIAL SECURITY ACTION**

Re: Dkt. No. 10

Plaintiff C.P.[1] challenges the final decision of the Commissioner of Social Security (the Commissioner) denying her application for disability insurance benefits under Title II of the Social Security Act.  Both parties consented to magistrate judge jurisdiction (ECF Nos. 7, 8) and filed briefs on the merits in accordance with the Federal Rules of Civil Procedure's Supplemental Rules for Social Security Actions Under 42 U.S.C. § 405(g).  ECF Nos. 10, 11.  For the reasons discussed below, the Court finds in favor of C.P.  The matter is REMANDED for further administrative proceedings consistent with this Order.  The Clerk shall enter judgment in favor of C.P.

## I.    BACKGROUND

C.P. is a fifty-year-old woman with peripheral neuropathy, among other conditions, who lives with her mother, partner, and four children in San Jose.  C.P. applied for disability benefits on March 17, 2022, claiming that her disability began on July 18, 2020.  *See* Administrative Record (AR) at 254.[2]  C.P. last met the insured status requirements of the Social Security Act on

---

[1] Because opinions by the Court are more widely available than other filings, and this Order contains potentially sensitive medical information, this Order refers to the plaintiff only by her initials.  This Order does not alter the degree of public access to other filings in this action provided by Rule 5.2(c) of the Federal Rules of Civil Procedure and Civil Local Rule 5-1(c)(5)(B)(i).

[2] This Order cites to the administrative record using the continuous page numbers applied by the

United States District Court
Northern District of California

December 31, 2020, and thus had to establish that she was disabled between July 18, 2020 and December 31, 2020. *See id.* at 20. Her application was denied initially and on reconsideration. *Id.* at 276, 287. C.P. requested an administrative hearing, which was held by phone on October 12, 2023, in front of Administrative Law Judge Roxanne Kelsey (the ALJ). *Id.* at 293. C.P. testified about her symptoms and their impact on her, and vocational expert Jamellia Greathouse testified about jobs that would be available to an individual with a variety of limitations. *Id.* at 37-62. The ALJ subsequently determined that C.P. could perform sedentary work and thus was not disabled. *Id.* at 26. C.P. requested that the ALJ's decision be reviewed, her request was denied, and she proceeded to file the instant action. *Id.* at 518; ECF No. 1 (Compl.).

### A.   Medical History

This summary is not intended as a complete statement of the administrative record or of all relevant evidence, but rather summarizes the medical evidence most pertinent to the ALJ's decision, the briefs in this matter, and the Court's analysis.

C.P. suffers from peripheral neuropathy, migraines, and PTSD, among other conditions. C.P. was diagnosed with peripheral neuropathy in 2017 and sought treatment through Kaiser's Pain Medicine Center. *See* AR at 549. She was prescribed Lyrica and Cymbalta for her pain and transitioned back to her primary care physician when her condition stabilized. *Id.* During a November 2019 podiatry appointment for painful calluses, C.P. reported numbness in her feet and explained that her neuropathic pain was controlled with Cymbalta and Lyrica. *Id.* at 597. The podiatrist noted that C.P. had a history of of peripheral neuropathy and chronic pain syndrome, among other conditions. *Id.* A progress note from a February 2020 podiatry appointment similarly documented C.P.'s history of peripheral neuropathy and chronic pain and noted that she had "diminished" sensation distally. *Id.* at 594. In March 2020, C.P. was seen for back pain, a "toe problem," and toenail fungus. *Id.* at 593. Her doctor noted that she did not think C.P.'s toenail condition contributed to her neuropathy pain. *Id.* An April 2020 progress note from emergency room visit for overuse of cough medicine listed peripheral neuropathy and chronic pain

---

Commissioner. This Order cites all other documents filed on the docket by page numbers assigned by the Court's ECF filing system, unless otherwise indicated.

United States District Court
Northern District of California

United States District Court
Northern District of California

condition as two of C.P.'s active problems, and she was noted as taking Lyrica and Cymbalta for her chronic pain. *Id.* at 588. C.P. reported experiencing "sharp pain" in her "hand and finger" in July 2020. *Id.* at 579. Aside from a gynecologist appointment in September 2020 (with notes listing C.P.'s peripheral neuropathy and chronic pain syndrome as "active" problems), it appears that C.P.'s next substantive medical appointment was in July 2021.[3] *Id.* at 572. She reported "noticing significant episodes of increasing pain" in her left foot and ankle during the past month. *Id.* at 572. She was referred to remote pain management classes, which she started in September 2021, and Kaiser's Pain Medicine Department. *Id.* at 568, 572.

C.P. attended a series of appointments for her neuropathy in November 2021. At a November 12, 2021 appointment, she reported experiencing numbness and a "stabbing" pain in her feet up to her ankles that made it difficult to sleep, and occasionally feeling the same pain in her hands and arms. *Id.* at 566. She described her pain, on average, as a six out of ten, and explained that her pain impacted her walking, concentration, and sleep. *Id.* at 561-62. During a physical therapy evaluation on November 16, 2021, she described her pain as a three out of ten, explained that "standing, walking," and other weight-bearing activities aggravated her pain, and described taking "[f]requent rest breaks." *Id.* at 559. During her physical examination at that appointment, she was observed as having a hunched posture and "[a]trophy of bilateral lower extremities" and the plantar surfaces of her feet. *Id.* While there were some normal findings, her ability to flex her ankle was "limited by pain" and she was observed as having "poor" to "fair minus" gait. *Id.* at 559-60. The physical therapist noted that C.P.'s "decreased range of motion … , decreased strength, decreased balance, abnormal gait pattern, muscle hypotonicity and pain" impaired her functional ability. *Id.* at 561. The physical therapist determined that C.P. had "poor pacing of functional activities and has limited coping strategies to successfully manage flare ups," and would "greatly benefit from continued education and instruction on proper body mechanics, functional strength training and appropriate effective flare up management tools." *Id.* at 560.

---

[3] The record indicates that she received medication refills and two vaccinations between November 2020 and June 2021. *Id.* at 573. At the administrative hearing, C.P. testified that she did not receive much medical treatment in 2020 because she was sheltering in place. *Id.* at 52.

United States District Court
Northern District of California

November 17, 2021 progress notes from a pain specialist, Dr. Jonathan Gardes, indicated that C.P. "was stable in terms of chronic pain for about 4 years until about 2 months ago when she started to have periodic flares" of pain in her legs, feet, hands, and arms, and that C.P. sought reevaluation due to the "worsening flares." *Id.* at 549.  She was noted as having numbness in her feet, legs, and palms of her hands.  *Id.* at 552.  Her pain was rated at a four out of ten on "average" and, at its worst, at an eight out of ten.  *Id.*  C.P. was noted as having a normal mood and affect and being "thin."  *Id.* at 552.

C.P. attended two video visits with a social worker in December 2021 to discuss pain management.  During the first visit, C.P. reported that her foot pain remained "persistent and nearly constant" at a five out of ten, and that she also experienced pain in her hands and arms on an intermittent basis.  *Id.* at 544.  C.P. explained that simple tasks, such as taking a shower, caused pain flare ups.  *Id.*  The social worker discussed the importance of pacing activities and possible modifications—such as wearing shower shoes—to try to manage the pain.  *Id.* at 543-44.  At the second visit, C.P. reported that she had used shower shoes, "which seemed to help in the moment," but experienced more severe pain after she showered.  *Id.* at 543.  The social worker led C.P. through an activity to try to retrain her brain to be less reactive to pain.  *Id.*  At a later visit in December 2021, C.P. reported that she had increased her dose of Cymbalta but had not noticed any improvement.  *Id.* at 541.

C.P. was seen by a podiatrist in January 2022 for an infected toenail, bilateral foot pain, peripheral neuropathy, and Raynaud's Syndrome.  *Id.* at 539.  She reported that her pain was an eight out of ten and that she experienced a "stabbing" and "shooting" pain going down her legs that was aggravated by standing, walking, and squatting.  *Id.* at 539-40.  During a physical exam, she was observed to have diminished distal sensation, purplish toes, and numbness in her feet.  *Id.* at 539.

In March 2022, C.P. attended a video appointment where she was reported as having a "fair" response to "conservative treatment," although her reported pain was a seven out of ten and her medical provider noted that overall, her pain had "been getting worse in the past couple of months with increased frequency of more severe pain days than before."  AR at 530.  At that

United States District Court
Northern District of California

point, Plaintiff had re-enrolled in a pain management class, and she was advised to continue meditation, pacing her activities, exercising, using relaxation techniques and seeing a chiropractor to manage her pain. *Id.* at 533. She was prescribed Topiramate, in addition to Lyrica and Cymbalta. *Id.* C.P. reported that she had a "hard time taking care of [her] children because of pain." *Id.* at 534.

At a June 2022 appointment with Dr. Gardes, C.P. was reported as having a "good" response to conservative treatments for her neuropathy, although her pain in her hands was reported as a six out of ten. *Id.* at 727. She had completed the pain management class and reported that the classes were "very beneficial." *Id.* Although she reported some "brain fog" associated with her medications (at that point, she was taking Topiramate, Lyrica, and Cymbalta), she reported that "the level of pain relief is worth managing with the side effects." *Id.* During a subsequent telephone visit in September 2022, C.P. was reported as having a "good" response to conservative treatment and "stable" pain levels, although her pain was at a six out of ten. *Id.* at 785. C.P.'s pain flares were noted as being occasional, manageable, and brief. *Id.*

C.P.'s medical records also indicate a history of mental health conditions. During a telehealth visit in May 2020, C.P. reported that she was diagnosed with PTSD related to domestic violence and had low energy, fatigue, and feelings of guilt and anxiety. *Id.* at 582. She requested treatment for depression. *Id.* During a November 2021 evaluation by a pain psychologist, C.P. similarly reported that she had a history of depression and PTSD, and was experiencing stress related to parenting. *Id.* at 553-54; *see also id.* at 561-62. At that time, she was taking the antidepressant venlafaxine. *Id.* at 566. She reported "cognitive fogginess and difficulty with problem[] solving and focus," caused by her neuropathy medications. *Id.* As of June 2023, C.P. was diagnosed with persistent depressive disorder and generalized anxiety disorder, and received "individual counseling, rehabilitative counseling and case management." *Id.* at 914. C.P. was also diagnosed with migraines. *See id.* at 549, 575, 785.

**B.    Third-Party Reports**

C.P.'s partner, Sean Pratt, and C.P.'s mother, Holly Dougherty, submitted statements in support of C.P.'s application for disability benefits. AR at 508, 510-11. Mr. Pratt explained that

despite "receiving medications and prescribed physical therapy," C.P. experienced constant pain and discomfort which made it difficult for her to perform everyday tasks. *Id.* at 508. He noted that he had observed that C.P.'s medications, though they provided some relief from pain, caused "fogginess, difficulties with decision making and word finding, and persistent tiredness." *Id.* C.P.'s mother stated that she observed that C.P. experienced unpredictable flares of severe pain that would leave her immobilized several times a week, as well as constant lower-level pain. *Id.* at 510. She explained that C.P. took medication, which did "not eliminate the pain, only limits the intensity of the pain at times," and caused negative side effects including brain fog and forgetfulness. *Id.* C.P.'s mother also submitted a function report, where she answered various questions about C.P.'s medical conditions and their impact on her life. *See id.* at 450-57.

C.P. also submitted a letter from her treating therapist, Leanna Bravo. *Id.* at 914. Ms. Bravo stated that C.P.'s symptoms were consistent with a primary diagnosis of severe persistent depressive disorder and a secondary diagnosis of generalized anxiety disorder. *Id.*

### C.     Administrative Hearing

An administrative hearing was held on October 12, 2024. AR at 34. During the hearing, C.P. testified that she stopped working in July 2020 because "it was too painful" and that her pain has not "gotten any better." *Id.* at 38. She explained that she had constant pain in her legs and feet and did not having feeling in her fingertips, which made it impossible for her to "do buttons" or "feel textures." *Id.* at 47. She testified that, in addition to the ongoing pain in her lower extremities and numbness in her fingertips, she experienced pain in her hands and arms for up to two consecutive days twice each month. *Id.* She described her pain as being a "seven or eight" out of ten[4] on her worst days. *Id.* at 48. C.P. testified that she could lift about fifteen pounds, could stand for fifteen minutes, walk for five to ten minutes, and sit in an office-style chair for ten to fifteen minutes. *Id.* at 51-52.

The ALJ asked C.P. if she was able to take her youngest children, then aged seven and eleven, to school. *Id.* at 40. C.P. testified that she could drive them on her "good days"—on

United States District Court
Northern District of California

---

[4] She noted that she had "given birth without any pain medication, so compared to that," her flares of pain were "a seven." *Id.* at 48.

average three times a week—explaining that although driving increased her pain she could manage the ten to fifteen minute drive to their school. *Id.* at 40-41. She testified that if she had to drive for longer than fifteen minutes, she had "to stop and put [her] feet" above her heart for at least thirty minutes to decrease the pain. *Id.* at 41. She explained that her doctors had not recommended that she put her feet up after driving, but that she "just discovered that" and "[t]he doctors don't really know how to … manage daily living for this kind of neuropathy pain." *Id.* at 41-42. When the ALJ asked C.P. if she did "any household chores," C.P. testified that she did dishes, but, following instructions from her medical providers, she paced herself by doing household chores in ten-minute increments. *Id.* at 43-44. She explained that she would "push herself" to do housework for brief increments and then sit down with her feet elevated, practice breathing exercises she learned in her pain management classes, and "do … exercise[s]" on her back with her feet "up in the air" to get her "blood flowing," as instructed by her physical therapist. *Id.* She explained that she would lie on her back doing these remedial exercises for "[a]bout thirty minutes." *Id.* at 45. She explained that on the "real bad days," she could not do any housework or stand and instead would lie down with her legs elevated and heat wraps on her feet. *Id.* at 44.

C.P. testified that she did not have issues interacting with other people at her children's school or at stores, but that her medications affected her speech and memory and caused brain fog. *Id.* at 46-47.

When questioned by her counsel, C.P. testified that she received little treatment for her medical conditions in 2020 because she was "sheltering in place." *Id.* at 52. She also explained that doctors told her that her condition would "probably never get better" and there was "not a whole lot" to do to heal it. *Id.* at 52-23. She explained that, other than taking her prescribed medications and attending classes at the pain clinic, there was not much else her doctors could do and that going to the emergency room or taking narcotics would not help her condition. *Id.*

The ALJ and C.P.'s attorney questioned vocational expert Jamellia Greathouse. Ms. Greathouse testified that C.P.'s past work experience corresponded to working as a customer service clerk. *Id.* at 56. She explained that an individual who could understand, remember, and

carry out simple instructions (but not detailed ones) would be precluded from working as a customer service clerk but could work a number of sedentary jobs, such as a surveillance system monitor, delivery router, or appointment clerk. *Id.* at 57-58. Ms. Greathouse testified that none of these sedentary jobs would be available if the individual did not have "tactile sensation of the upper extremities." *Id.* at 59. She testified that there would be no jobs available for an individual who needed an extra unscheduled thirty-minute break during a workday or who needed to elevate their feet at or above their heart for ten to fifteen minutes out of every hour of sitting. *Id.* at 60-61.

### D.    The Five-Step Framework

The Social Security Administration uses a five-step process to determine whether claimants are entitled to disability benefits:

> Step 1. Is the claimant presently working in a substantially gainful activity? If so, then the claimant is "*not disabled*" within the meaning of the Social Security Act and is not entitled to disability insurance benefits. If the claimant is not working in a substantially gainful activity, then the claimant's case cannot be resolved at step one and the evaluation proceeds to step two. *See* 20 C.F.R. § 404.1520(b).

> Step 2. Is the claimant's impairment severe? If not, then the claimant is "*not disabled*" and is not entitled to disability insurance benefits. If the claimant's impairment is severe, then the claimant's case cannot be resolved at step two and the evaluation proceeds to step three. *See* 20 C.F.R. § 404.1520(c).

> Step 3. Does the impairment "meet or equal" one of a list of specific impairments described in the regulations? If so, the claimant is "*disabled*" and therefore entitled to disability insurance benefits. If the claimant's impairment neither meets nor equals one of the impairments listed in the regulations, then the claimant's case cannot be resolved at step three and the evaluation proceeds to step four. *See* 20 C.F.R. § 404.1520(d).

> Step 4. Is the claimant able to do any work that he or she has done in the past? If so, then the claimant is "*not disabled*" and is not entitled to disability insurance benefits. If the claimant cannot do any work he or she did in the past, then the claimant's case cannot be resolved at step four and the evaluation proceeds to the fifth and final step. See 20 C.F.R. § 404.1520(e).

> Step 5. Is the claimant able to do any other work? If not, then the claimant is "*disabled*" and therefore entitled to disability insurance benefits. *See* 20 C.F.R. § 404.1520(f)(1). If the claimant is able to do other work, then the Commissioner must establish that there are a significant number of jobs in the national economy that claimant can do. There are two ways for the Commissioner to meet the burden of showing that there is other work in "significant numbers" in the

United States District Court
Northern District of California

Case 3:24-cv-06986-LJC   Document 13   Filed 03/30/26   Page 9 of 24

> national economy that claimant can do: (1) by the testimony of a vocational expert, or (2) by reference to the Medical–Vocational Guidelines at 20 C.F.R. pt. 404, subpt. P, app. 2. If the Commissioner meets this burden, the claimant is "*not disabled*" and therefore not entitled to disability insurance benefits. *See* 20 C.F.R. §§ 404.1520(f), 404.1562. If the Commissioner cannot meet this burden, then the claimant is "*disabled*" and therefore entitled to disability benefits. *See id.*

*Tackett v. Apfel*, 180 F.3d 1094, 1098–99 (9th Cir. 1999) (footnote omitted); *see also Maxwell v. Saul*, 971 F.3d 1128, 1130 n.2 (2020). "At steps one through four, the claimant retains the burden of proof; at step five, the burden shifts to the Commissioner." *Maxwell*, 971 F.3d at 1130 n.2. If the Commissioner conclusively finds the claimant "disabled" or "not disabled" at any point in the five-step process, he does not proceed to the next step. 20 C.F.R. § 404.1520(a)(4).

### E.    The ALJ's Decision

The ALJ issued her decision denying C.P.'s application for disability benefits on December 14, 2023. AR at 27. The decision followed the five-step process outlined above. At step one, the ALJ determined that C.P. did not engage in any substantial gainful activity since July 18, 2020, the alleged onsets date of disability. *Id.* at 20. At step two, the ALJ determined that C.P. suffered from the following severe impairments: peripheral neuropathy of the feet; chronic pain syndrome; and migraines. *Id.* She determined that Plaintiff's neuropathic pain in the hands was not severe, explaining that there was "no indication that the claimant requires ongoing specialized care for neuropathy in her hands," the record showed only an isolated instance of neuropathy in the hands, and "no medical source opined that these conditions cause functional limitations." *Id.* at 21. The ALJ determined that although C.P. was diagnosed with depression and PTSD, these conditions did "not result from anatomical, physiological, or psychological abnormalities" and there was "no indication that claimant requires the specialized care of a psychologist or psychiatrist to manage these conditions." *Id.* At step three, the ALJ determined that C.P.'s impairments did not meet or equal one of the specific impairments listed at 20 C.F.R. 404.1520(d), 404.1525 and 414.1526. *Id.*

The ALJ next evaluated C.P.'s residual functional capacity, finding that C.P. could perform a full range of sedentary work. She determined that C.P.'s "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the

United States District Court
Northern District of California

claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." *Id.* at 23. The ALJ recognized that the medical record described C.P.'s "longitudinal symptoms of peripheral neuropathy of the feet (but not necessarily the hands), chronic pain, and migraines" which was consistent with C.P.'s testimony, function report, and subjective complaints. *Id.* at 23. She likewise found that C.P.'s "pursuit of treatment provides some support for her allegations." However, the ALJ determined that C.P.'s allegations regarding her neuropathy were not "fully consistent with the overall record," as follows:

> The claimant appeared to be neurologically intact with largely normal sensation and strength. The claimant also routinely presented a normal gait, and she did not present significant difficulty moving about. Furthermore, the claimant did not present significant muscle weakness. This evidence is not consistent with her allegations that she has difficulty using her extremities or completely unable to move. In November 2021, the claimant's treatment notes show that her chronic pain was "stable" for about four years until recently. Nonetheless, the claimant reported that the pain is "quite intermittent" and generally happens once every couple of weeks. While the claimant complained of profound sleep disturbances, she did not appear to be fatigued. The claimant responded well to conservative treatment … . Furthermore, the record contains evidence that the claimant reported some benefit from exercise, physical therapy, and a chronic pain management program.

*Id.* at 23-24. The ALJ observed that C.P.'s doctor noted that C.P. had a "good" response to conservative treatment and her pain levels were stable, and that C.P. reported improvement from medications. *Id.* at 24. Although C.P. had reported "some brain fog associated with her medications," the ALJ noted that C.P. also reported that she felt that "the level of pain relief is worth managing with the side effects." *Id.* Regarding C.P.'s testimony about elevating her legs, the ALJ commented that "there is no evidence in the record that a treating source recommended this or found it medically necessary.  While the claimant may be doing this, it appears to be volitional." *Id.* The ALJ next found that the record did not fully support C.P.'s allegations regarding her migraines. *Id.* She noted that "the record does not contain evidence of brain scans, abnormal brain activity, or significant nervous systems issues[,] … a headache journal, migraine cocktails, ongoing emergency room treatment, or Botox injections," and that C.P. reported being

able to read, use electronic devices, handle her finances, and perform household chores. *Id.* The ALJ found that C.P.'s "admitted" ability to perform "most aspects of personal care, simple chores, childcare, driving, shopping in stores/online, and reading" was inconsistent with her alleged limitations. *Id.* at 25.

The ALJ next determined that C.P.s mother's report of C.P.'s conditions was "not at all consistent with the claimant's treatment notes." *Id.* at 24. She noted that despite C.P.'s "complaints of chronic pain," her medical records did not reflect signs "frequently present in the individual who suffers from severe and disabling pain," such as "weight loss, premature aging, muscle atrophy from non-use or facial expressions such as grimacing." *Id.* The ALJ did not evaluate C.P.'s partner's report or the letter (*id.* at 914) submitted by C.P.'s therapist. *See id.* at 24.

The ALJ concluded that "the severity of the claimant's allegations" were "generally inconsistent with the record as a whole" and that the impact of C.P.'s conditions were adequately accounted for by limiting C.P. "to a full range of sedentary work." *Id.* at 25. Although the ALJ determined that C.P. could not perform her past relevant work as a customer service clerk, the ALJ applied the Medical-Vocational Guidelines (the grids) and determined that, based on C.P.'s age, education, work experience, and RFC, C.P. "was capable of making a successful adjustment to other work that existed in significant numbers in the national economy" and was thus not disabled. *Id.* at 26.

## II.    STANDARD OF REVIEW

Pursuant to 42 U.S.C. § 405(g), a district court has authority to review a Commissioner's decision to deny disability benefits to a claimant. "The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities." *Ahearn v. Saul*, 988 F.3d 1111, 1115 (9th Cir. 2021) (quoting *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)). The district court's role is "to ensure that the [ALJ's] decision was supported by substantial evidence and a correct application of the law." *Ludwig v. Astrue*, 681 F.3d 1047, 1051 (9th Cir. 2012). "'Substantial evidence' means more than a mere scintilla, but less than a preponderance, i.e., such relevant evidence as a reasonable mind might accept as adequate to

11

support a conclusion." *Robbins v. Social Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006). The Court must "consider the entire record as a whole, 'weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion.'" *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (quoting *Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998)). "Where the evidence can reasonably support either affirming or reversing the decision, [the Court] may not substitute [its] judgment for that of the Commissioner." *Parra v. Astrue*, 481 F.3d 742, 746 (9th Cir. 2007). Courts "review only the reasons provided by the ALJ in the disability determination and may not affirm the ALJ on a ground upon which he did not rely." *Garrison v. Colvin*, 759 F.3d 995, 1010 (9th Cir. 2014).

## III.   ANALYSIS

C.P. argues that the ALJ erred in several respects. *See* ECF No. 10 at 12-23. First, she contends that the ALJ erred by formulating a residual functional capacity that required C.P. to stand for up to two hours of each day and did not account for her mental health conditions, neuropathy of the hands, and non-exertional limitations caused by C.P.'s chronic pain, migraines and side effects of her medications. Next, C.P. contends that the ALJ erred by discrediting C.P.'s testimony without clear and convincing reasons supported by substantial evidence for doing so. Lastly, C.P. contends that the ALJ erred by rejecting third-party reports without germane reasons for doing so.

The Commissioner argues Plaintiff failed to show that she was disabled between July 18, 2020 and December 31, 2020. ECF NO. 11 at 2. He further contends that the ALJ's RFC determination was supported by substantial evidence and the record did not evidence the need for additional limitations; that the ALJ reasonably and clearly evaluated C.P.'s symptom testimony; and that the ALJ reasonably evaluated the third-party statements and was not required to articulate germane reasons for discounting them.

The Court first addresses the pertinence of medical records and other evidence in the AR from outside of the period under review—that is, from before the alleged onset of disability and after C.P.'s date last insured (DLI). The Court next evaluates C.P.'s argument that the ALJ improperly discredited her testimony, and, as a result, erred in formulating C.P.'s RFC.

12

United States District Court
Northern District of California

### A.   Evidence from Outside the Period Under Review

As noted above, C.P. claims that she became disabled on July 18, 2020, and she last met the insured status requirements of the Social Security Act on December 31, 2020.[5]  AR at 20, 254. To be found disabled, C.P.'s disability must thus be found to have precluded her from work between July 18 and December 31, 2020.  The AR includes medical notes from one appointment during this period, when C.P. was seen by a gynecologist after reporting a "lump."  *See id.* at 574-77.  There is no indication that C.P.'s extremities were examined or that her neuropathy pain levels were tested during that appointment.  *Id.*  At the administrative hearing, C.P.'s attorney asked her why she did not "receive a lot of treatment for [her] conditions" during the latter half of 2020.  *Id.* at 52.  C.P. explained that she was "sheltering in place then."  *Id.*  The Commissioner, noting the lack of medical records from this period, acknowledged that "the period under review occurred in 2020 during the COVID-19 pandemic."  ECF No. 11 at 4 n.4.

Presumably because of the relative dearth of medical records from this period,[6] the ALJ relies heavily on C.P.'s records from both before the disability onset date and after C.P.'s DLI. *See* AR at 21-24.  Although the Commissioner argues that "the record shows that Plaintiff's symptoms were under control" between July 18, 2020 and December 31, 2020, the Court reviews "only the reasons provided by the ALJ in the disability determination and may not affirm the ALJ on a ground upon which he did not rely."  *Garrison*, 759 F.3d at 1010.  Thus, as the ALJ relied on C.P.'s medical records from outside the period under review in reaching her determination, the Court evaluates these records and the ALJ's analysis of them in this Order.  *See Connett v. Barnhart*, 340 F.3d 871, 874 (9th Cir. 2003) ("We are constrained to review the reasons the ALJ asserts.").

### B.   The ALJ's Evaluation of Plaintiff's Testimony

The Court now turns to the substance of C.P.'s arguments.  Among other things, C.P.

---

[5] December 31, 2020 is thus C.P.'s date last insured.  *See* ECF No. 12 at 2.

[6] The Court notes that a claimant's failure to seek treatment or pursuit of limited treatment does not necessarily mean that they are not disabled or detract from a claimant's credibility.  SSR 16-3p (2016); *Orn v. Astrue*, 495 F.3d 625, 638 (9th Cir. 2007); *see Blanca T. v. O'Malley*, No. 23-cv-00159, 2024 WL 6847881, at *4 (C.D. Cal. Mar. 27, 2024) (determining that claimant's failure to seek treatment did not support ALJ's conclusion that claimant's "symptoms had improved," in light of "the extraordinary circumstance of the COVID-19 pandemic," among other reasons).

argues that the ALJ erred by discrediting C.P.'s testimony about the severity of her symptoms without clear and convincing reasons for doing so.  ECF No. 10 at 18.

### 1.    Legal Standard

The Ninth Circuit has "established a two-step analysis for determining the extent to which a claimant's symptom testimony must be credited." *Trevizo v. Berryhill,* 871 F.3d 664, 678 (9th Cir. 2017).  "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged." *Id.* (quoting *Garrison v. Colvin*, 759 F.3d 995, 1014–15 (9th Cir. 2014)).   If the claimant meets this requirement and there is no evidence of malingering, "the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so.  This is not an easy requirement to meet: The clear and convincing standard is the most demanding required in Social Security cases." *Id.*  To satisfy the "clear and convincing reasons" requirement, "[g]eneral findings are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Brown-Hunter v. Colvin*, 806 F.3d 487, 493 (9th Cir. 2015) (quoting *Reddick*, 157 F.3d at 722).  In weighing the claimant's credibility, the ALJ may consider many factors, including "(1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities." *Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008) (quoting *Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996)).  The ALJ may also include observations of treating physicians and "other third parties regarding, among other matters, the nature, onset, duration, and frequency of the claimant's symptom; precipitating and aggravating factors; [and] functional restrictions caused by the symptoms." *Smolen*, 80 F.3d at 128.   The ALJ's reasons must be" supported by substantial evidence in the record." *Thomas v. Barnhart,* 278 F.3d 947, 959 (9th Cir. 2002).

### 2.    Analysis

Here, the ALJ found that C.P.'s medically determinable impairments could reasonably be

14

expected to cause her alleged symptoms. AR at 23. The ALJ made no finding of malingering. *See id.* Therefore, the ALJ could reject C.P.'s "testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so." *Trevizo*, 871 F.3d at 678. In relevant part, C.P. testified that she had pain in her feet and legs "every day and all the time" as well as intermittent flares of pain in her feet and legs, had constant numbness in her fingertips, and had flares of pain in her hands and arms twice a month for two days at a time. AR at 47. She testified that, on her worst days, her pain was a seven or eight out of ten. *Id.* at 48. She explained that she could stand for approximately fifteen minutes, walk for five to ten minutes, and sit in a chair for ten to fifteen minutes, before needing to rest and elevate her feet above her heart. *Id.* at 51-52. The ALJ determined that C.P.'s "statements concerning the intensity, persistence and limiting effects of [her] symptoms are not entirely consistent with the medical evidence and other evidence in the record." AR at 23. C.P. argues, and the Court agrees, that the ALJ failed to provide specific, clear, and convincing reasons supported by substantial evidence for this conclusion. Although the Commissioner argues broadly that the ALJ "sufficiently explained her reasons for discounting [C.P.'s] symptom testimony," the Commissioner does not substantively respond to any of C.P.'s arguments. ECF No. 11 at 7-8.[7] The Court addresses C.P.'s arguments as follows.

### a.     Stability or Improvement

The ALJ determined that C.P.'s allegations regarding her neuropathy symptoms were inconsistent with treatment notes reflecting that her pain had been "stable" for several years and that C.P. experienced "significant improvement" with treatment. ECF No. 10 at 19; AR at 23-24. "Contradiction with the medical record is a sufficient basis for rejecting the claimant's subjective testimony." *Smartt v. Kijakazi*, 53 F.4th 489, 499 (9th Cir. 2022). However, as C.P. argues, while the record shows that at times C.P.'s pain levels were stable or improving, this does not demonstrate that her pain was non-severe or not disabling, or contradict her testimony to that

---

[7] The Commissioner explains that the Court "can easily follow [the ALJ's] reasoning and meaningfully review those reasons" for discounting C.P.'s symptom testimony. *Id.* at 7. While it is certainly helpful when an ALJ's decision is clearly written, this does not bear on whether the *substance* of the ALJ's decision is sound or meets the applicable legal standards.

United States District Court
Northern District of California

effect.  *See* AR at 549, 727; *Garrison*, 759 F.3d at 1017 (explaining that "improved functioning while being treated" did not necessarily mean that a claimant was well enough to function in a workplace).

The ALJ noted that C.P.'s treatment notes from November 2021 showed that C.P.'s chronic pain had been "'stable' for about four years until recently."  AR at 23.  But medical conditions "can be stable but disabling[;]" "stable" indicates a lack of change, not that a condition was minor.  *Petty v. Astrue*, 550 F. Supp. 2d 1089, 1099 (D. Ariz. 2008); *see, e.g.,* AR at 785 (treatment note describing C.P.'s pain levels as "stable on her medication regiment for about 6 months or so," but still at a six out of ten).  Similarly, the fact that C.P.'s pain got worse after a certain date does not show that it was non-disabling before.  *See Sarah B. v. Comm'r of Soc. Sec.*, No. 23-cv-564, 2023 WL 7126580, at *4 (W.D. Wash. Oct. 30, 2023) ("Plaintiff can experience disabling symptoms before the DLI even if those symptoms subsequently worsen.").

Along similar lines, treatment notes indicating "improvement" say little about C.P.'s actual ability to function, as one's condition can improve but still be severe or disabling.  Tellingly, in medical notes that the ALJ cites to as a reason to discount C.P.'s symptom testimony, C.P.'s doctor reported that C.P. had found pain management classes "very beneficial," there was "significant improvement in her neuropathy pain," and C.P. had a "good" response to treatment.  AR at 727, 785; *see id.* at 24.  Despite this language indicating improvement, C.P.'s pain was rated at a six out of ten.  AR at 727, 785.  That is, the record indicates that C.P. could both respond positively to treatment and still experience significant pain.  That her doctors noted some improvement is thus not a clear and convincing reason to discount C.P.'s testimony about her pain levels or function.  Moreover, to the extent the ALJ found that C.P. was not credible because her most severe symptoms were intermittent (*see* AR at 25), the Ninth Circuit has held that "it is error to reject a claimant's testimony merely because symptoms wax and wane in the course of treatment.  Cycles of improvement and debilitating symptoms are a common occurrence … ." *Garrison*, 759 F.3d at 1017 (internal citations omitted).

The Court accordingly agrees with C.P. that the ALJ's decision to discount C.P.'s treatment testimony due to reported periods of "improvement," "stability," and fluctuating levels

16

of pain was improper.

### b.    Conservative Treatment

The ALJ found that C.P.'s testimony regarding the severity of her symptoms were inconsistent with her "conservative" treatment. *Id.* at 23. "[E]vidence of 'conservative treatment' is sufficient to discount a claimant's testimony regarding severity of an impairment." *Parra v. Astrue*, 481 F.3d 742, 751 (9th Cir. 2007) (quoting *Johnson v. Shalala*, 60 F.3d 1428, 1434 (9th Cir. 1995)).  But what constitutes "conservative treatment" necessarily turns on what treatment is available and "whether a claimant experiencing the symptoms testified to would be expected to seek further treatment." *Remi S. v. Comm'r of Soc. Sec.*, No. 25-cv-1373, 2025 WL 3653716, at *2 (W.D. Wash. Dec. 17, 2025).  C.P. took multiple medications, used topical gels, completed pain management classes, and practiced physical therapy, breathing exercises, and meditation to try to manage her pain. *See, e.g.*, AR at 23.  "[T]he record does not reflect that more aggressive treatment options were appropriate or available" or that C.P. refused them. *Lapeirre-Gutt v. Astrue*, 382 F. App'x 662, 664 (9th Cir. 2010 (explaining that "[a] claimant cannot be discredited for failing to pursue non-conservative treatment options where none exist").  Rather, the record shows instances where increased medication did not improve C.P.'s symptoms.  AR at 530, 541. C.P. testified that there was "not a whole lot" that she or her doctors could do to improve her condition, and that going to the emergency room or taking narcotics would be futile. *Id.* at 53. Absent evidence that more aggressive treatment options were available or would have been effective, that C.P. only received "conservative" treatment was not a clear and convincing reason for the ALJ to discredit her testimony.

Moreover, to the extent the ALJ determined that C.P.'s gaps in treatment for her neuropathy during 2020 were inconsistent with C.P.'s testimony regarding the severity of her condition, the Court notes that C.P. testified that she received little treatment for her medical conditions in 2020 because she was "sheltering in place." AR at 52.  The Commissioner acknowledged that "the period under review occurred in 2020 during the COVID-19 pandemic." ECF No. 11 at 4 n.4.  Although an "unexplained, or inadequately explained, failure to seek treatment" may support an adverse credibility finding, given the "extraordinary circumstance of

United States District Court
Northern District of California

17

the COVID-19 pandemic," without further evidence regarding C.P.'s reasons for not seeking treatment for her neuropathy during this period, C.P.'s lack of treatment is not clear and convincing reason to discredit her symptom testimony. *Orn*, 495 F.3d at 636 (internal quotations omitted); *Blanca T.*, 2024 WL 6847881, at *4.

### c.    Activities of Daily Living

The ALJ determined that C.P.'s allegations regarding the severity of her pain was "inconsistent" with C.P.'s ability to perform "most aspects of personal care, simple chores, childcare, driving, shopping in stores/online, and reading." AR at 25. As C.P. notes, the ALJ provided no support for her statement that C.P. was able to perform most activities of daily living. *See id.* The record indicates that, although C.P. was able to complete some household tasks and other activities of daily living, she did so with assistance and with frequent breaks: C.P. lives with her mother, partner, and four children. *See* AR at 450-57, 508, 582. Her mother and partner help with chores and childcare. *Id.* at 443, 511. C.P.'s pain was aggravated by standing, walking, or weight-bearing activities (*see id.* at 559) and, as instructed by her medical providers, C.P. needed to pace herself by engaging in activities for short intervals followed by periods of rest. *See, e.g., id.* at 544, 559-60, 742.

The ALJ did not set forth clear and convincing reasons explaining how C.P.'s testimony regarding her symptoms was inconsistent with this record. *See* AR at 25. C.P. testified that she "modified" household chores and childcare tasks by performing these tasks for ten to fifteen minutes at a time before pausing for up to half an hour with her feet elevated her and practicing breathing exercises, and then returning to her task for another ten-minute increment. *Id.* at 44. She explained that because her children's schools were a ten-to-fifteen-minute drive away, she could drive them "on her good days," and that she could complete "a quick trip around the aisles of the grocery store" in under ten minutes. *Id.* at 41, 51. On her bad days, she could not stand, do any housework, or take her children to school. *Id.* at 44. A drive longer than fifteen minutes, she found, necessitated a rest for at least thirty minutes. *Id.* at 40-41. This testimony, if anything, appears consistent with the medical record, which shows that C.P. was instructed to "pace" her daily activities to manage her pain (*see id.* at 544, 730), and the ALJ does not point to any

18

United States District Court
Northern District of California

evidence contradicting C.P.'s testimony. *Id.* at 25; *see Garrison*, 759 F.3d at 1016 ("We have repeatedly warned that ALJs must be especially cautious in concluding that daily activities are inconsistent with testimony about pain, because impairments that would unquestionably preclude work and all the pressures of a workplace environment will often be consistent with doing more than merely resting in bed all day."); *Ferguson v. O'Malley*, 95 F.4th 1194, 1203 (9th Cir. 2024) ("Only if the level of activity [is] inconsistent with Claimant's claimed limitations do daily activities have any bearing on Claimant's credibility.") (internal quotations omitted).

Relatedly, the ALJ dismissed C.P.'s testimony that she needed to elevate her feet to manage her pain, finding that there was "no evidence in the record that a treating source recommended this or found it medically necessary." AR at 24. C.P. argues that this "was not a clear and convincing reason to discredit" C.P.'s symptom testimony. The Court agrees. In relevant part, C.P. testified that she needed to elevate her feet for up to half an hour after a period of driving or standing and could only sit in a chair with her feet down for ten to fifteen minutes. AR at 41, 44, 50-51. Although the medical records do not show that C.P. was specifically instructed to elevate her feet above her heart, she received physical therapy and took pain management classes that taught her "self management including but not limited to new novel movements such as Tai Chi, yoga, self-massage" and "stretching and strengthening for the lower extremities." AR at 560, 740-41. C.P. testified that her physical therapist told her to lie on her back with her "feet up in the air" to get her blood flowing. AR at 44. Nothing in the record contradicts C.P.'s testimony that elevating her feet helped manage her pain. Furthermore, that C.P. used this as a tool for pain management absent a doctor's direct instruction is not a clear and convincing reason to discredit C.P.'s testimony. *See Ferguson*, 95 F.4th at 1200-01; *cf. Coleman v. Saul*, 979 F.3d 751, 756 (9th Cir. 2020) (instructing that ALJs may "not discredit the claimant's subjective complaints solely because the objective evidence fails to fully corroborate the degree of pain alleged").

### d.    Lack of Typical Symptoms

C.P. next argues that the ALJ improperly discounted C.P.'s symptom testimony by finding that her testimony was inconsistent with medical records that did not show that C.P. exhibited

signs of chronic pain such as "significant muscle weakness," "weight loss, premature aging, muscle atrophy from non-use or facial expressions such as grimacing." AR at 23-24; ECF No. 10 at 21. The Court agrees with C.P. that the ALJ erred in two respects.

First, the record contradicts the ALJ's statement that none of C.P.'s treating sources "reported observing any of the signs … frequently present in the individual who suffers from severe and disabling pain," such as weight loss, rapid aging, or muscle atrophy. AR at 24. During physical therapy assessments, C.P. was observed as having "[a]trophy of bilateral lower extremities, a "poor" to "fair minus" gait, low muscle "tone through bilateral lower extremities and plantar surfaces" on both feet, "decreased range of motion … , decreased strength, decreased balance, abnormal gait pattern, [and] muscle hypotonicity" (low muscle tone). *Id.* at 559-61. She is repeatedly noted as being slender. *See, e.g.*, *id.* at 552, 554. The ALJ erred in singling out C.P.'s "intact" or "largely normal" examination findings to discredit C.P. while ignoring the parts of the record that supported C.P.'s symptom testimony. *Id.* at 24-25; *see Garrison*, 759 F.3d at 1018 ("While ALJs obviously must rely on examples to show why they do not believe that a claimant is credible, the data points they choose must *in fact* constitute examples of a broader development to satisfy the applicable 'clear and convincing' standard."); *Simone A. v. Kijakazi*, No. 23-cv-05223, 2024 WL 3467348, at *5 (N.D. Cal. July 18, 2024) (disapproving of ALJ's reliance on "normal" examination findings "as a basis for discounting Plaintiff's subjective symptom testimony" where the ALJ highlighted "portions of the record which describe 'normal' findings" but ignored "statements—often from the very same visit—which document abnormal" findings).

Second, it was improper for the ALJ to point to a lack of particular medical evidence to discredit C.P.'s subjective symptom testimony about the extent of her pain and her functional limitations. The Ninth Circuit has established that "at step two of the symptom analysis, the ALJ cannot rely on an *absence* of positive medical evidence to discredit a claimant's subjective symptom testimony." *Ferguson*, 95 F.4th at 1201. While "*inconsistent* objective medical evidence in the record" can properly be used to discount subjective symptom testimony, the *absence* of objective medical evidence corroborating the degree of alleged pain cannot. *Id.* at

1200-01.  C.P. did not always display the symptoms the ALJ expected from someone with severe chronic pain, but, as "subjective pain is not always verifiable through a physical examination," C.P.'s lack of particular results is not a clear and convincing reason to discount her testimony regarding her pain.  *Glanden v. Kijakazi*, 86 F.4th 838, 847 (9th Cir. 2023).  The Court also notes that the ALJ provided no support for her statement that individuals with severe chronic pain "frequently" exhibit "weigh loss, premature aging, muscle atrophy from non-use or facial expressions such as grimacing."  AR at 24.

The Court accordingly concludes that the ALJ failed to provide clear and convincing reasons, supported by substantial evidence, for determining that C.P.'s "statements concerning the intensity, persistence and limiting effects of [her] symptoms are not entirely consistent with the medical evidence."  AR at 24-25; *see Ferguson*, 95 F.4th at 1199.

**C.      The ALJ's RFC Determination**

C.P. argues that the ALJ erred in determining that she had the residual functional capacity (RFC) to perform a full range of sedentary work with no non-exertional limitations.  ECF No. 10 at 12.

A Social Security claimant's RFC is what the claimant is capable of doing despite his or her mental and physical limitations.  20 C.F.R. § 404.1545(a)(1); *Valentine*, 574 F.3d at 689; *Mayes v. Massanari*, 276 F.3d 453, 460 (9th Cir. 2001).  An RFC is "an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis."  Social Security Ruling (SSR) 96-8p: Titles II & XVI: Assessing Residual Functional Capacity in Initial Claims, 1996 WL 374184, at *1 (July 2, 1996).  "In determining a claimant's residual functional capacity, the ALJ must consider all of a claimant's medically determinable impairments, including those that are not severe."  *Ghanim v. Colvin*, 763 F.3d 1154, 1166 (9th Cir. 2014) (citing 20 C.F.R. § 404.1545(a)(2)).  The ALJ must consider all relevant evidence in formulating an RFC, and "an RFC that fails to take into account a claimant's limitations is defective."  *Valentine*, 574 F.3d at 690.  "[S]ubstantial evidence does not support an ALJ's RFC assessment if 'the ALJ improperly rejected [the claimant's] testimony as to the severity of his pain and symptoms.'"  *Ferguson*, 95 F.4th at 1199 (quoting *Lingenfelter*, 504 F.3d

United States District Court
Northern District of California

21

at 1035).

The ALJ determined that C.P. had the residual functional capacity to perform a full range of sedentary work.  AR at 21.  20 C.F.R. § 404.1567(a) defines sedentary work as work that:

> [I]nvolves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

"'Occasionally' means occurring from very little up to one- third of the time," and "[t]he full range of sedentary work requires that an individual be able to stand and walk for a total of approximately 2 hours during an 8-hour workday."  Social Security Ruling (SSR) 96-9p, 1996 WL 374185, at *3, *6 (1996).  "In order to perform a full range of sedentary work, an individual must be able to remain in a seated position for approximately 6 hours of an 8-hour workday, with a morning break, a lunch period, and an afternoon break at approximately 2-hour intervals."  *Id.* at *6.

As discussed above, the ALJ erred in rejecting C.P.'s testimony regarding the "intensity, persistence and limiting effects" of her symptoms without clear and convincing reasons, supported by substantial evidence, for doing so.  AR at 24.  This led the ALJ to, among other things, not credit C.P.'s testimony that she managed her pain by pacing activities, that she was only able to walk, stand, or sit in a chair for ten to fifteen minutes before needing to take a break and elevate her legs above her heart and complete breathing exercises, and that she did not "have a lot of feeling" in her fingertips and could not "do buttons" or other "little things."  *Id.* at 23-26; *see id.* at 45, 48-49.  The ALJ then proceeded to formulate an RFC that did not account for C.P.'s reported need to take frequent breaks; limit her time sitting, standing, or walking; elevate her feet; or account for C.P.'s limited use of her hands.  Although the ALJ claimed to take into account C.P.'s disorders "by limiting her to a full range of sedentary work," she did not address that, absent other limitations, sedentary work requires standing for up to two hours each day and does not permit frequent breaks.  *Id.* at 25.  This was error.  *See Ferguson*, 95 F.4th at 1199 ("[S]ubstantial evidence does not support an ALJ's RFC assessment if the ALJ improperly rejected [the

claimant's] testimony as to the severity of his pain and symptoms.") (internal quotations omitted).

As C.P. explains, this error was not harmless. *See* ECF No. 10 at 12. The ALJ determined that C.P. was not disabled by applying the Medical-Vocational Rules (the grids) and determining that C.P. could perform work that existed in significant numbers in the national economy. AR at 26. "The grids categorize jobs by their physical-exertional requirements" and present "various combinations of factors relevant to a claimant's ability to find work"—the claimant's age, education, and work experience. *Tackett v. Apfel*, 180 F.3d 1094, 1101 (9th Cir. 1999). "For each combination of these factors … the grids direct a finding of either 'disabled' or 'not disabled' based on the number of jobs in the national economy in that category of physical-exertional requirements." *Id.* ALJs may use the grids when a claimant is able to perform the full range of jobs in a given category—in this case, the category of sedentary work—but use of the grids is "inappropriate" when a claimant has "significant non-exertional impairments," such as pain or postural limitations. *Id.* at 1102 (internal quotations omitted). Had the ALJ credited C.P.'s testimony regarding her need to sit after ten to fifteen minutes on her feet and elevate her feet after sitting, use of the grids would have been inappropriate. *See id.* at 1103-04 (finding that the claimant's "need to shift, stand up, or walk around every 30 minutes is a significant non-exertional limitation not contemplated by the grids").

Moreover, the vocational expert testified that there would be no sedentary jobs in the national economy available for a hypothetical individual who needed to take one unscheduled thirty-minute break each workday, needed to elevate their feet for ten to fifteen minutes for each hour of sitting, or could not feel with their fingertips. AR at 60-61. If the ALJ had found C.P.'s described need for rest breaks and to elevate her feet credible, or credited C.P.'s testimony regarding her fingers, and formulated an RFC that accounted for these limitations, she would have presumably had to have found C.P.'s limitations work preclusive. This is not to say that the ALJ *must* determine that C.P. is disabled on remand, but only to illustrate that the ALJ's RFC determination hinges on her credibility determination, such that an improper credibility determination likewise renders the RFC determination improper. *See Ferguson*, 95 F.4th at 1199.

United States District Court
Northern District of California

**D.    The Court Does Not Reach C.P.'s Remaining Arguments**

Because the ALJ's errors in assessing C.P.'s testimony—and the corresponding errors in determining C.P.'s RFC—require reversal and remand for further administrative proceedings, the Court need not reach C.P.'s remaining arguments.  C.P. does not seek a judicial determination of disability, so any further error in the ALJ's decision would not alter the outcome of this case—that further proceedings are necessary.

**IV.    CONCLUSION**

For the reasons discussed above, the Court REVERSES the Commissioner's decision finding C.P. not disabled and denying her application for benefits, and REMANDS the matter for further administrative proceedings consistent with this Order, including directing the Commissioner to reevaluate Plaintiff's credibility as to the severity of her symptoms and what limitations to assess based on her symptoms.  This may require (but is not limited to) obtaining additional medical records or testimony from C.P. regarding her treatment and symptoms during 2020; C.P.'s ability to complete activities of daily living and sit or stand for extended periods of time; the availability of other courses of treatment; and C.P.'s functioning during periods of stability or improvement.

The Clerk shall enter judgment in favor of C.P. and close the case.

**IT IS SO ORDERED.**

Dated: March 30, 2026

_____
LISA J. CISNEROS
United States Magistrate Judge